# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* LUAY D.F. AILABOUNI, M.D., STATE OF ILLINOIS *ex rel.* LUAY D.F. AILABOUNI, M.D., and LUAY D.F. AILABOUNI, M.D., individually,<br><br>Plaintiffs,<br><br>v.<br><br>ADVOCATE HEALTH AND HOSPITALS CORPORATION, ADVOCATE CHRIST HOSPITAL AND MEDICAL CENTER, ADVOCATE HEALTH CARE NETWORK, ADVOCATE MEDICAL GROUP, GEORGE F. MESLEH, M.D., RODNEY H. THILL, M.D., WILLIAM M. HOPKINS, M.D., CARDIOTHORACIC & VASCULAR SURGERY ASSOCIATES, DEAN M. GOVOSTIS, M.D., MARTIN I. ELLENBY, M.D., WADE W. KANG, M.D., JACK C. ROBERTS, M.D., SANJEEV PRADHAN, M.D., PAUL J. GORDON, M.D., and SAMMI NAWAS, M.D.,<br><br>Defendants. | Case No. 13-cv-1826<br><br>Judge John Robert Blakey |

## <u>MEMORANDUM OPINION AND ORDER</u>

Relator/Plaintiff Luay Ailabouni filed this *qui tam* action under the False Claims Act (FCA), 31 U.S.C. § 3729, *et seq.*, and the Illinois False Claims Act (IFCA), 740 ILCS 175/1, *et seq.*, on behalf of the United States and the State of Illinois. Relator sues Advocate Health and Hospitals Corporation; two of its d/b/a entities, Advocate Christ Medical Center and Advocate Medical Group; Advocate Health Care Network; George F. Mesleh, M.D.; Rodney H. Thill, M.D.; and William M. Hopkins, M.D. (the Advocate Defendants). Relator also sues Cardiothoracic &

1

Vascular Surgical Associates (CVSA); Dean M. Govostis, M.D.; Martin I. Ellenby, M.D.; Wade W. Kang, M.D.; Jack C. Roberts, M.D.; Sanjeev Pradhan, M.D.; Paul J. Gordon, M.D.; and Sammi Nawas, M.D. (the CVSA Defendants).

Relator alleges that, since 2006, the defendants have defrauded Medicare and Medicaid in various ways through their activities in a teaching hospital. Relator amended his complaint in August 2016. [19]. In November 2016, the Advocate Defendants and the CVSA Defendants moved to dismiss. [59]; [63]. This Memorandum Opinion and Order addresses both pending motions. For the reasons explained below, both motions are granted and the amended complaint [19] is dismissed without prejudice.

## I.   Background[1]

### A.   Graduate Medical Education

Medicare is a federal health insurance program established under Title 18 of the Social Security Act, 42 U.S.C. § 1395, *et seq.* Primarily, Medicare serves the disabled and those over the age of 65. [19] ¶ 31. The Centers for Medicare and Medicaid Services (CMS), a federal agency within the Department of Health and Human Services, administers Medicare. *Id.* Medicaid is a public assistance program that pays medical expenses mainly for the poor and disabled. *Id.* ¶ 32. The federal government and state governments jointly fund Medicaid. *Id.* Illinois' Department of Healthcare and Family Services administers Illinois Medicaid. *Id.* ¶ 33.

---

[1] The Court draws facts from the amended complaint [19], and from judicially noticeable information about Medicare's operations, which both sides have cited.

Medicare gives teaching hospitals two types of funding—collectively called GME funding—to subsidize residency programs. *Id.* ¶ 39. Direct Graduate Medical Education (DGME) payments cover the direct costs of a residency program, such as residents' salaries. *Id.* ¶ 40. Indirect Medical Education (IME) payments cover the indirect costs of a residency program, such as higher patient-care costs associated with residents "ordering extra tests." *Id.* ¶ 42. DGME payments are calculated using information that teaching hospitals give CMS in their Medicare Cost Reports (MCR), such as the number of full-time equivalent residents working at the hospital. *Id.* ¶ 44. IME payments are a percentage add-on to Medicare's standard reimbursement for inpatient services for a given diagnosis, and are partly based upon the number of residents at a teaching hospital, relative to its size. *Id.* ¶ 43.

Teaching hospitals submit MCRs to CMS annually to apply for GME funding; MCR representations affect how much GME funding a teaching hospital gets. *Id.* ¶¶ 44–45, 80. Each MCR certifies that "the services identified in this cost report were provided in compliance with [the] laws and regulations" governing the provision of health care services. *Id.* ¶ 81. To receive GME funding, a teaching hospital must be accredited by a private accreditation body. *Id.* ¶ 84. Accreditation bodies promulgate standards for residency programs and certify programs that are in "substantial compliance" with standards. *Id.* ¶¶ 48, 84.

Because Medicare subsidizes residents' services in teaching hospitals, Medicare expects residents, rather than non-resident medical providers, to assist primary physicians during surgeries whenever possible. *Id.* ¶ 36. So, when a

teaching hospital "has a training program related to the medical specialty required for the surgical procedure and has a qualified resident available to perform the service," Medicare pays for a non-resident "assistant at surgery" only under limited conditions. Ctrs. for Medicare & Medicaid Servs., Pub. 100-04, Medicare Claims Processing Manual Ch. 12, § 100.1.7A (2017) (CMS Manual). Those conditions include "exceptional medical circumstances" and "complex medical procedures performed by a team of physicians, each performing a discrete, unique function." 42 C.F.R. § 415.190(c). Payment under section 415.190(c) does not depend on qualified residents being unavailable. Section 415.190(b) defines "assistant at surgery" as "a physician who actively assists the physician in charge . . . in performing a surgical procedure," but the CMS Manual explains that a nurse practitioner (NP) or physician assistant (PA) may serve as an assistant at surgery if authorized to do so by state law. CMS Manual § 100.1.7B.

Aside from the situations specified in section 415.190(c), Medicare also pays for an assistant at surgery when no qualified resident was available during the procedure. *Id.* § 100.1.7A. Medicare recognizes that teaching hospitals will not always have qualified residents available, whether because of "[residents'] involvement in other activities, complexity of the surgery, number of residents in the program, or other valid reasons." *Id.* To receive payment for an assistant at surgery when no qualified resident was available, teaching hospitals either add billing modifier -82 to the claim for reimbursement—indicating that no qualified resident was available—or submit the following certification to Medicare:

> I understand that [the Social Security Act] generally prohibits Medicare physician fee schedule payment for the services of assistants at surgery in teaching hospitals when qualified residents are available to furnish such services. I certify that the services for which payment is claimed were medically necessary and that no qualified resident was available to perform the services.

*Id.* Relator alleges that Medicare and Medicaid have identical requirements for paying for assistants at surgery in teaching hospitals. *See, e.g.*, [19] ¶¶ 35–36.

## B. This Case

Relator is a physician who was a resident in the general surgery residency program at the University of Illinois at Chicago (UIC) from 2007 to 2012. *Id.* ¶ 18. UIC's general surgery, vascular surgery, and cardiothoracic surgery residency programs operate out of Advocate Christ Medical Center (ACMC), a teaching hospital owned by Advocate Health and Hospitals Corporation (AHHC). *Id.* ¶¶ 18–25. ACMC is (and was at all relevant times) accredited by the Accreditation Council for Graduate Medical Education (ACGME). *Id.* ¶ 47. All physician defendants are or were teaching physicians in the residency programs described above. *Id.* ¶ 25.

The other Advocate Defendants are entities related to AHHC and individual physicians who practice or practiced within Advocate Medical Group. *Id.* ¶¶ 19–23. The Advocate entities contracted with UIC to provide and maintain the aforementioned residency programs. *Id.* ¶¶ 25, 79. The CVSA Defendants are an unincorporated association and the individual physicians who practice or practiced under CVSA's name. *Id.* ¶ 24.

Relator alleges that, since at least 2006, Defendants have defrauded Medicare and Medicaid out of millions of dollars by submitting fraudulent claims and falsified MCRs.  Specifically, Relator alleges that Defendants:

- **Improperly billed and were paid for assistants at surgery when residents were available to assist with surgeries.** *See id.* ¶¶ 51–54. Relator claims that the physician defendants colluded to report that no qualified surgical residents were available to assist with procedures even when surgical residents were available.  Relator claims that the Advocate entities then billed for assistant-at-surgery services provided by non-resident physicians, PAs, and NPs, despite knowing that surgical residents had been available.

- **Engaged in an organized scheme to exclude residents from surgeries.** *See id.* ¶¶ 55–74.  Relator claims that the physician defendants commonly "double scrubbed"—meaning two non-resident physicians prepared to perform surgery—to enrich themselves and their colleagues.  Relator also claims that some physician defendants routinely barred residents from participating in their surgeries so the defendants could instead use PAs that they were related to or knew personally.

- **Submitted false MCRs to CMS.** *See id.* ¶¶ 75–89.  Relator claims that ACMC received GME funding to which it was not entitled because its MCRs included information about the procedures described above for which it billed fraudulently.

- **Failed to return Medicare and Medicaid overpayments.** *See id.* ¶¶ 90–91.  Relator claims that Medicare and Medicaid providers who receive overpayments must report and return the excess money.  Relator claims that the fraudulent claims and MCRs described above resulted in overpayments that Defendants knowingly failed to return.

Relator originally filed suit in March 2013.  [1].  Relator amended his complaint in August 2016.  [19].  The United States and the State of Illinois declined to intervene shortly after.  [20].  Relator brought two claims in his amended complaint:

- **Count I.** FCA violations for knowingly presenting, or causing to be presented to the government, a false or fraudulent claim for payment, *see*

6

31 U.S.C. § 3729(a)(1)(A); knowingly making or using a false record or statement material to a false or fraudulent claim paid by the government, *see* § 3729(a)(1)(B); and knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government, *see* § 3729(a)(1)(G).[2]

- **Count II.** Corresponding IFCA violations. *See* 740 ILCS 175/1 *et seq.*

[19] ¶¶ 92–106.

## II. Legal Standard

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "challenges the sufficiency of the complaint for failure to state a claim upon which relief may be granted." *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1080 (7th Cir. 1997). A motion to dismiss does not test the merits of a case. *Autry v. Nw. Premium Servs., Inc.,* 144 F.3d 1037, 1039 (7th Cir. 1998).

To survive a motion to dismiss, a complaint must first provide a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), giving the defendant "fair notice" of what the claim is "and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Second, a complaint must contain "sufficient factual matter" to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). That is, the allegations must raise the possibility of relief above the

---

[2] The FCA was amended most recently in 2009, so some of Relator's allegations span different versions of the statute. *See United States ex rel. O'Donnell v. Am. At Home Healthcare & Nursing Servs., Ltd.*, No. 14-cv-1098, 2017 WL 2653070, at *3 n.2 (N.D. Ill. June 20, 2017). The precise language of the different versions does not alter the Court's substantive analysis. For ease of reading, the Court refers to statutory provisions in their current designation.

"speculative level." *EEOC v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007). A claim has facial plausibility "when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). The plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013).

Thus, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Limestone Dev. Corp. v. Vill. of Lemont*, 520 F.3d 797, 803 (7th Cir. 2008). In evaluating a complaint, the Court accepts all well-pleaded allegations as true and draws all reasonable inferences in the plaintiff's favor. *Iqbal*, 556 U.S. at 678. The Court is not, however, required to accept a complaint's legal conclusions as true. *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009).

Because the FCA and IFCA are anti-fraud statutes, claims under both must also meet Rule 9(b)'s heightened pleading requirements. *United States ex rel. Gross v. AIDS Research Alliance–Chi.*, 415 F.3d 601, 604 (7th Cir. 2005). Rule 9(b) demands that claimants alleging fraud "state with particularity the circumstances constituting fraud." Particularity is analogous to a reporter's hook: a plaintiff "ordinarily must describe the who, what, when, where, and how of the fraud—the first paragraph of any newspaper story." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 441–42 (7th Cir. 2011) (internal

quotation marks omitted). For example, if the alleged fraudulent scheme involves misrepresentation, the plaintiff must state who made "the misrepresentation, the time, place, and content of the misrepresentation, and [how] the misrepresentation was communicated." *United States ex rel. Grenadyor v. Ukrainian Vill. Pharmacy, Inc.*, 772 F.3d 1102, 1106 (7th Cir. 2014).

Although different cases require different levels of detail for a complaint to satisfy Rule 9(b), *Pirelli*, 631 F.3d at 442, a plaintiff must inject "precision and some measure of substantiation" into fraud allegations. *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 776 (7th Cir. 2016) (internal quotation marks omitted). Rule 9(b) is even more significant in cases with multiple defendants who need to understand the claims against them. "Because fair notice is perhaps the most basic consideration underlying Rule 9(b), the plaintiff who pleads fraud must reasonably notify the defendants of their purported role in the scheme." *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 777–78 (7th Cir. 1994) (citations and internal quotation marks omitted).

## III.  Analysis

### A.    The FCA and IFCA

The FCA seeks "to protect the funds and property of the Government from fraudulent claims," *Rainwater v. United States,* 356 U.S. 590, 592 (1958), by imposing civil liability on individuals or entities that make such claims. *See* 31 U.S.C. § 3729(a)(1). Enacted in 1863, the FCA "was originally aimed principally at stopping the massive frauds perpetrated by large contractors during the Civil War."

*United States v. Bornstein,* 423 U.S. 303, 309 (1976). Congress has since amended the FCA numerous times, but the Act still focuses upon "those who present or directly induce the submission of false or fraudulent claims." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1996 (2016).

A "claim" includes direct payment requests to the Government, as well as "reimbursement requests made to the recipients of federal funds under federal benefits programs" like Medicare and Medicaid. *Id.*; *see also* § 3729(b)(2)(A). In its present incarnation, the FCA allows the government to recover treble damages and penalties of up to $10,000 for each false claim. § 3729(a). The FCA also allows private citizens, called relators, to file civil actions on the government's behalf. 31 U.S.C. § 3730(b)(1). These cases are called *qui tam* actions. *Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 768 n.1 (2000) (explaining that *qui tam* is short for a Latin phrase meaning "who pursues this action on our Lord the King's behalf as well as his own"). Prevailing relators collect a sizeable portion of any funds recovered for the government's benefit. *Id.* IFCA claims are evaluated under the same standards as FCA claims. *Cunliffe v. Wright*, 51 F. Supp. 3d 721, 740 (N.D. Ill. 2014).

The FCA and IFCA each prohibit: (1) knowingly presenting, or causing to be presented, a false or fraudulent claim for payment, § 3729(a)(1)(A); 740 ILCS 175/3(a)(1)(A); (2) knowingly making or using, or causing to be made or used, a false record or statement that is material to a false or fraudulent claim, § 3729(a)(1)(B); § 175/3(a)(1)(B); and (3) knowingly making or using, or causing to be made or used, a

false record or statement material to an obligation to pay or transmit money or property to the government, or knowingly concealing or improperly avoiding or decreasing an obligation to pay or transmit money or property to the government, § 3729(a)(1)(G); § 175/3(a)(1)(G). Relator alleges violations of all three prohibitions.

To adequately plead a violation of § 3729(a)(1)(A) of the FCA or its IFCA counterpart, Relator must allege: (1) a false or fraudulent claim; (2) which was presented, or caused to be presented, by the defendant to the United States for payment or approval; (3) with the knowledge that the claim was false. *United States ex rel. Fowler v. Caremark RX, L.L.C.,* 496 F.3d 730, 741 (7th Cir. 2007), *overruled on other grounds by Glaser v. Wound Care Consultants, Inc.,* 570 F.3d 907 (7th Cir. 2009).

To adequately plead a violation of § 3729(a)(1)(B) of the FCA or its IFCA counterpart, Relator must allege: (1) that the defendant made a statement in order to receive money from the government; (2) the statement was false; and (3) the defendant knew the statement was false. *Thulin v. Shopko Stores Operating Co.*, 771 F.3d 994, 998 (7th Cir. 2014). The misrepresentation also "must be material to the other party's course of action." *Escobar*, 136 S. Ct. at 2001.

To adequately plead a violation of § 3729(a)(1)(G) of the FCA or its IFCA counterpart, Relator must allege: (1) that the defendant had an existing legal obligation to pay or transmit money or property to the government; and (2) the defendant submitted false statements or records to conceal, avoid, or decrease that obligation. *United States ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 242 (3d Cir.

2004).  Under the FCA, "obligation" means "an established duty . . . arising from a [contractual relationship or] from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment."  § 3729(b)(3).

Stated broadly, the Defendants argue that the allegations in Relator's amended complaint: (1) are not sufficiently particular under Rule 9(b); and (2) fail to state claims for which relief may be granted under Rule 12(b)(6).  The Court addresses each argument in turn.

## B.    Preliminary Matters

Relator alleges that Medicare and Medicaid will pay for an assistant at surgery in a teaching hospital only "in extraordinarily limited circumstances."  [19] ¶ 38.  In subsequent briefing, Relator claims that those circumstances could be "an affirmative defense," but are irrelevant on a motion to dismiss.  [70] at 21.  The Court disagrees with Relator's characterization of the conditions in section 415.190(c) as affirmative defenses.  In relevant part, section 415.190 provides:

(a) *Basis, purpose, and scope.*  This section describes the conditions under which Medicare pays on a fee schedule basis for the services of an assistant at surgery in a teaching hospital.

. . . .

(c) *Conditions for payment for assistants at surgery.*  Payment on a fee schedule basis is made for the services of an assistant at surgery in a teaching hospital only if the services meet one of the following conditions:

    (1) Are required as a result of exceptional medical circumstances.

    (2) Are complex medical procedures performed by a team of physicians, each performing a discrete, unique function integral to the

performance of a complex medical procedure that requires the special skills of more than one physician.

(3) Constitute concurrent medical care relating to a medical condition that requires the presence of, and active care by, a physician of another specialty during surgery.

(4) Are medically required and are furnished by a physician who is primarily engaged in the field of surgery, and the primary surgeon does not use interns and residents in the surgical procedures that the surgeon performs (including preoperative and postoperative care).

(5) Are not related to a surgical procedure for which CMS determines that assistants are used less than 5 percent of the time.

An affirmative defense negates civil or criminal liability even if the defendant committed the alleged acts. *See, e.g.*, *Black's Law Dictionary* 430 (7th ed. 1999) (listing duress, insanity, and self-defense as examples of affirmative defenses). In contrast, if the defendants here satisfied section 415.190(c) when they billed for assistants at surgery, then that fact would not negate civil liability—it would mean there never was civil liability in the first place. The fact that section 415.190(c)'s conditions differ from Medicare's general policy of not paying for assistants at surgery in teaching hospitals does not transform them into affirmative defenses. Section 415.190(c) expressly specifies the circumstances when Medicare pays for assistants at surgery, regardless of resident availability. Simply put, those five conditions *are* the rules.

Relator also claims that a "qualified resident" means any resident training in the specialty required for a procedure, regardless of the resident's level of experience or the primary physician's assessment of the resident's skills. *See, e.g.*, [19] ¶¶ 57–59; [70] at 3–4 ("'Qualified individual on the staff of the hospital' means

a resident in a training program relating to the specialty required for surgery.")
(quoting 47 Fed. Reg. 43653 (Oct. 1, 1982)). For support, Relator cites the language
of section 415.190(a):

> . . . Except as specified in paragraph (c) of this section, fee schedule
> payment is not available for assistants at surgery in hospitals with—
>
>> (1) A training program relating to the medical specialty required
>> for the surgical procedure; and
>>
>> (2) A resident in a training program relating to the specialty
>> required for the surgery available to serve as an assistant at surgery.

While Relator's citation is ostensibly correct, the regulation requires a more
nuanced reading.

During the rulemaking process for section 415.190 (then numbered 405.580),
physicians commented that some surgeries would not fall under section
415.190(c)(2)'s definition of "complex medical procedures" even though they were
sufficiently complex that "residents would not generally have the expertise or
experience" to assist. 48 Fed. Reg. 7173 (Feb. 18, 1983). CMS responded that
Medicare would pay for an assistant at surgery if a teaching hospital furnished
documentation "that no *qualified* resident was available." *Id.* By emphasizing the
word "qualified," CMS acknowledged that residents from a given training program
are not universally qualified to assist in surgeries for that training program's
specialty. Also, the CMS Manual specifically contemplates that qualified residents
might not be available because of the "complexity of the surgery," among other valid
reasons. CMS Manual § 100.1.7A. In other words, while section 415.190 presumes
that residents in a certain training program are qualified to assist in surgeries for

14

that specialty, the regulation also allows primary physicians to exercise their medical judgment in determining that residents from the applicable training program are not qualified to assist on a specific procedure.

## C. Particularity

### 1. Generalized Allegations Against "Defendants"

Throughout his amended complaint, Relator makes numerous allegations against "Defendants" without defining to whom the allegations specifically refer. *See, e.g.*, [19] ¶¶ 51, 55, 64, 68. The Court will not address those allegations in depth. Such generalized assertions about a group of disparate defendants are so broad as to be essentially meaningless within the context of this case. Any allegation that "lumps all defendants together" and is "bereft of any detail" about who did what fraudulent activity necessarily fails to satisfy Rule 9(b). *Sears v. Likens*, 912 F.2d 889, 893 (7th Cir. 1990). Both motions to dismiss are granted to the extent Relator's theory of liability depends upon allegations against "Defendants" as an undefined group.

### 2. Physician Defendants

#### a) *William Hopkins*

Relator alleges that William Hopkins:

- Used his daughter, a PA, instead of an available resident to assist during an October 2011 surgery on a Medicare recipient. [19] ¶ 65.

- Regularly performed surgeries at ACMC on Tuesdays "for many years" to facilitate using his daughter as an assistant and excluding residents. "One resident in particular worked with Defendant Hopkins on the general surgery service at ACMC from August 24, 2010 thru [sic] October

25, 2010, and personally observed this practice on multiple occasions. Multiple other residents had similar experiences." *Id.* ¶ 66.

The first allegation lacks the requisite details to satisfy Rule 9(b). To be sure, no complaint must anticipate or "attempt to plead around" all possible defenses. *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004). But section 415.190(c)'s conditions are *not* affirmative defenses, and Medicare allows physicians to exercise their medical judgment in determining that no *qualified* resident was available to assist with surgery. Thus, Relator must plead more than this barebones allegation—a Medicare recipient had surgery and a surgical resident was present—to establish the "who, what, when, where, and how" of the fraud. *Pirelli*, 631 F.3d at 441–42. By way of example only: Which surgery did Hopkins perform, and why did that not fall within section 415.190(c)? Why was the resident qualified to assist with that surgery—had she assisted other physicians with the same procedure? Without answers to these types of questions, Relator has failed to plead fraud with sufficient particularity.

Likewise, the second allegation lacks sufficient particularity. A sweeping claim that Hopkins excluded residents from surgeries "for many years" is far too broad to pass muster under Rule 9(b). The claim that another resident "personally observed the practice on multiple occasions" over a two-month period also lacks the requisite details. Other than an approximate date and the fact that Hopkins was involved, Relator has not provided any other "first paragraph" details of the fraud. *Id.* Which surgeries did Hopkins exclude residents from, and why did those not fall within section 415.190(c)? Why were the excluded residents qualified to assist with

the surgeries?  Again, without answers to these types of questions, Relator has not pled fraud with sufficient particularity.  Hopkins is dismissed.

### b)    George Mesleh

Relator alleges that George Mesleh's "regular practice and policy" was to exclude assigned residents from his surgeries in favor of his "personal PA."  [19] ¶ 67.  In support of that general claim, Relator alleges that:

- Representatives from UIC spoke to Mesleh "several times between 2008 and 2011 about the impropriety of using PAs for assistant surgeons when residents were readily available." *Id.* ¶ 69.

- Mesleh was dismissed from UIC's teaching service in February 2011 and reinstated the next month.  UIC's notice reinstating Mesleh said: "the rule against replacing an available resident with a PA remains in full force for all attendings . . . and the consequence of ignoring this rule remains removal from the teaching service for any attending who violates it, including Dr. Mesleh." *Id.* ¶ 70.

The first allegation, read in the light most favorable to Relator, raises an inference that Mesleh used PAs for assistant surgeons instead of residents at some point between 2008 and 2011, but that inference alone is not enough to satisfy Rule 9(b).  When an alleged fraudulent scheme occurs over many years, a relator "need not provide the details of every fraudulent transaction," but must provide "representative examples." *United States ex rel. Kalec v. NuWave Monitoring, LLC,* 84 F. Supp. 3d 793, 800 (N.D. Ill. 2015) (citations omitted).  Relator has not provided any representative examples or any concrete details of the fraud beyond an overly broad three-year window.  The first allegation is deficient under Rule 9(b).

The second allegation is also deficient under Rule 9(b).  Read in the light most favorable to Relator, this allegation raises an inference that Mesleh was

temporarily dismissed from UIC's teaching service because he used PAs for assistant surgeons instead of residents at some point between 2008 and 2011. Again, that inference alone is not enough to satisfy Rule 9(b). To plead fraud with particularity, Relator must provide representative examples and specifics, *id.*, such as when Mesleh improperly used a PA and why doing so was improper for that surgery. Mesleh is dismissed.

### c) Wade Kang

Relator alleges that Wade Kang:

- Served as an assistant surgeon for a December 2010 surgery on a Medicare recipient and stated in his operative report that no qualified surgical resident was available, although Relator—then a resident—was "present and qualified to assist." [19] ¶ 57.

- Was "known to double scrub" as part of the "Drs. Govostis, Ellenby, Kang, and Pradhan group." *Id.* ¶ 72. This allegation came from meeting notes for a 2012 meeting of UIC's Committee on Graduate Medical Education (the GME Committee). *Id.*

These allegations fail to satisfy Rule 9(b). The first allegation provides a date, but otherwise lacks the requisite details, such as the type of surgery and an explanation of why Relator was qualified to assist. The second allegation alludes to a broad time period without including any representative examples or specifics—in other words, without including the "who, what, when, where, and how of the fraud." *Pirelli*, 631 F.3d at 441–42. Kang is dismissed.

### d) Dean Govostis

Relator alleges that Dean Govostis:

- Served as a surgeon on three surgeries (one in December 2010 and two in January 2012) for which an operative report stated that no qualified

18

resident was available when a resident had been "present and qualified to assist." [19] ¶¶ 57–59.

- Responded to questions from Relator and another resident in the spring of 2012 about why he commonly noted that "no resident" or "no qualified resident" was available for his surgeries by stating "that he was obligated to teach his junior partners technique." *Id.* ¶ 62.

- Was "known to double scrub" as part of the "Drs. Govostis, Ellenby, Kang, and Pradhan group." *Id.* ¶ 72. This allegation came from meeting notes for a 2012 meeting of the GME Committee. *Id.*

None of these allegations provide the requisite details to satisfy Rule 9(b). The first allegation gives surgery dates and says which doctors participated, but otherwise omits the necessary specifics, such as the type of surgery that Govostis performed and why the available resident was qualified to assist. The third allegation alludes to a broad time period without including any representative examples or specifics—in other words, without including the "who, what, when, where, and how of the fraud." *Pirelli*, 631 F.3d at 441–42.

The second allegation, read in the light most favorable to Relator, raises an inference that Govostis fraudulently noted—at some point before or during 2012— that qualified residents were unavailable because he wanted his junior partners to assist in surgery instead. Without any accompanying "first paragraph details" of the alleged fraud, that inference alone cannot satisfy Rule 9(b)'s heightened standards for pleading fraud. *Id.* The second allegation does not list any representative examples or other specifics of when Govostis improperly noted that qualified residents were unavailable. Govostis is dismissed.

### e)    *Sanjeev Pradhan*

Relator alleges that Sanjeev Pradhan:

- Served as a surgeon on two surgeries in January 2012 for which an operative report stated that no qualified resident was available when a resident had been "present and qualified to assist." [19] ¶¶ 58–59.

- Was "known to double scrub" as part of the "Drs. Govostis, Ellenby, Kang, and Pradhan group." *Id.* ¶ 72. This allegation came from meeting notes for a 2012 meeting of the GME Committee. *Id.*

Neither allegation satisfies Rule 9(b). The first allegation provides dates for the surgeries and states which doctors were involved, but otherwise omits the necessary specifics, such as the type of surgery that Pradhan performed and why the available resident was qualified to assist. The second allegation alludes to a broad time period without including any representative examples or specifics—in other words, without including the "who, what, when, where, and how of the fraud." *Pirelli*, 631 F.3d at 441–42. Pradhan is dismissed.

### f)    *Martin Ellenby*

Martin Ellenby appears in only two paragraphs of the body of the amended complaint. [19] ¶¶ 24, 72. The first paragraph lists Ellenby's name and says that he practices under CVSA. *Id.* ¶ 24. The second paragraph includes Ellenby's name in a quote from May 2012 notes for a GME Committee meeting: "On multiple occasions during each rotation, the attending physicians of the Drs. Govostis, Ellenby, Kang and Pradhan group have been known to double scrub. The resident, should he be present at all, has a very limited to non-existent role in the case." *Id.* ¶ 72. This allegation lacks the elements of particularity that Rule 9(b) requires.

Relator alludes to a broad time period without including any representative examples or specifics—again omitting the "who, what, when, where, and how of the fraud." *Pirelli*, 631 F.3d at 441–42. Ellenby is dismissed.

### 3. Entity Defendants

#### a) *Advocate Medical Group*

Relator alleges that Advocate Medical Group (AMG), along with CVSA and all physician Defendants, "submitted in excess of 33,000 claims to the Medicare program from 2006 thru [sic] 2015 and received millions of dollars to which they were not entitled." [19] ¶ 54. This sweeping allegation does not satisfy Rule 9(b). Relator provides no representative examples or specifics (beyond a nine-year window) to implicate AMG in fraud.[3] AMG is dismissed.

#### b) *Cardiothoracic & Vascular Surgical Associates*

Relator makes the following allegations about CVSA:

- CVSA, AMG, and the individual physicians in each medical group "collectively submitted in excess of 33,000 claims to the Medicare program from 2006 thru [sic] 2015 and received millions of dollars to which they were not entitled." *Id.* ¶ 54.

- Other hospital defendants knew of "the behavior of CVSA and CVSA MDs in double scrubbing . . . and improperly using surgical billing modifiers for assistant surgeons." *Id.* ¶ 63.

Both allegations are far too broad to satisfy Rule 9(b). The first alludes to a nine-year period without providing any specifics, such as how many claims each entity submitted in a given year. The second vaguely asserts that CVSA's surgeons

---

[3] The Court has dismissed all physicians who practice or practiced under AMG, either because Relator's claims against them did not satisfy Rule 9(b) or because Relator failed to state a claim against them.

double scrubbed improperly and that CVSA then fraudulently billed for those services, but does not provide any representative examples or details.[4] Absent any "measure of substantiation," this is not enough under Rule 9(b). *Presser*, 836 F.3d at 776. CVSA is dismissed.

### 4. Relator's Individual Theories of Liability

#### a) *DGME and IME Fraud through Fraudulent MCRs*

Relator alleges that AHHC and ACMC defrauded Medicare out of DGME and IME payments by submitting MCRs that reflected fraudulent billing practices. *See* [19] ¶¶ 75–89 ("Medicare would not have made the DGME and IME payments had it known of the true facts."). Relator also alleges that ACMC should have been ineligible to receive GME funding because ACGME would not have maintained the hospital's accreditation "had it known the hospital was excluding its surgical residents from both routine and complex surgeries." *Id.*

Because of Relator's position as a surgical resident at ACMC, this Court could not expect Relator to have intimate knowledge of the precise details contained in each annual MCR or the process for submitting MCRs to CMS. *See, e.g.*, *Presser*, 836 F.3d at 778 ("Considering [the relator's] position as a nurse practitioner, a position that does not appear to include regular access to medical bills, we do not see how she would have been able to plead more facts pertaining to the billing process."). Given Relator's allegations that ACMC received millions of dollars in DGME and IME payments for each year between 2006 and 2013, that receiving GME funding depends upon submitting an annual MCR to CMS, and that each

---

[4] The Court dismissed all CVSA physicians for the same reasons it dismissed the AMG physicians.

MCR contains a certification that a teaching hospital is in compliance with applicable laws and regulations, [19] ¶¶ 50, 80–81, Relator adequately pled that ACMC submitted MCRs to CMS that certified compliance with the law. *See, e.g.*, *Leveski v. ITT Educ. Servs., Inc.*, 719 F.3d 818, 838–39 (7th Cir. 2013) (explaining that, at the outset of litigation, a plausible inference of a false submission can satisfy Rule 9(b) and a relator does not need to produce the false document).

But to adequately plead that ACMC's MCRs were *fraudulent*, Relator needs more than broad conclusory allegations—of physicians at ACMC "foregoing the utilization of available and qualified residents for surgery services" and ACMC fraudulently billing Medicare for assistant-at-surgery services, [19] ¶ 82—that do not themselves satisfy Rule 9(b) (or, alternately, do not state a claim). Relator alleges nothing new in the section of his amended complaint addressing DGME and IME fraud, and instead makes general references to the fraudulent practices he alleges elsewhere. In this opinion, this Court dismisses every physician defendant and every entity defendant. Relator cannot rely on dismissed claims from elsewhere in his amended complaint to support his allegations of GME fraud.

To the extent Relator attempts to add to his MCR argument in any subsequent filing by asserting that ACMC falsified the number of full-time equivalent residents working in the hospital, [70], that effort is rejected. Aside from an exception that does not apply here, courts may only consider the plaintiff's complaint when ruling on a 12(b)(6) motion. *Burke v. 401 N. Wabash Venture, LLC*,

714 F.3d 501, 505 (7th Cir. 2013). Both motions to dismiss are granted to the extent Relator's theory of liability depends upon GME fraud.

### D. Failure to State a Claim

#### 1. Physician Defendants

##### a) *Rodney Thill*

Relator alleges that Rodney Thill, who was the Site Program Director for UIC's general surgery residency:

- Learned about Mesleh's improper use of PAs as assistant surgeons when Relator informed Thill of the issue in November 2010. [19] ¶ 69.

- Was "routinely apprised and aware of Defendants' unlawful and fraudulent conduct as herein alleged." *Id.* ¶ 74.

These claims fail because they allege only that Thill knew that other people behaved improperly by using PAs instead of residents as assistant surgeons. Even assuming that the other defendants' conduct was fraudulent, Thill is not liable because "mere knowledge of a fraud [cannot] sustain an FCA cause of action." *Kalec*, 84 F. Supp. 3d at 802. To state a claim, Relator would have to allege that Thill took an "active role" in submitting false claims or material fraudulent documents to the government. *Id.* (citing *Gross*, 415 F.3d at 604). Relator has not done so. Thill is dismissed.

##### b) *Jack Roberts, Paul Gordon, and Sammi Nawas*

Jack Roberts, Paul Gordon, and Sammi Nawas are defendants in name only. They appear in only one paragraph in the body of the amended complaint; that paragraph merely says that all three doctors practice under CVSA. [19] ¶ 24.

24

Relator does not allege that Roberts, Gordon, or Nawas committed fraud—or did anything at all. When a complaint "alleges no specific act or conduct on the part of the defendant and the complaint is silent as to the defendant except for his name appearing," dismissing the defendant is proper. *Black v. Lane*, 22 F.3d 1395, 1401 n.8 (7th Cir. 1994) (quoting *Potter v. Clark*, 497 F.2d 1206, 1207 (7th Cir. 1974) (per curiam)). Roberts, Gordon, and Nawas are dismissed. This Court reminds Relator that any future attempt to include these defendants in a new complaint must, of course, comply with the good-faith requirements of the Federal Rules of Civil Procedure.

### 2. Entity Defendants

#### a) *Advocate Health Care Network*

Like Roberts, Gordon, and Nawas, Advocate Health Care Network (AHCN) is an improper and largely symbolic defendant. Aside from a general allegation in the amended complaint's introduction that AHCN, as part of the "Hospital Defendants," fraudulently obtained GME funds from Medicare, [19] ¶ 4, Relator does not allege any wrongdoing by AHCN. Relator merely describes AHCN as a "fully integrated health care delivery system" and says that AHCN, as part of the "Hospital Defendants," contracted with UIC to provide certain residency programs at ACMC. *Id.* ¶¶ 21, 25. When a complaint "alleges no specific act or conduct on the part of the defendant," dismissing the defendant is proper. *Black*, 22 F.3d at 1401 n.8 (quoting *Potter*, 497 F.2d at 1207). AHCN is dismissed.

### b)      Advocate Health and Hospitals Corporation

Relator continues the pattern with AHHC.  Along with a general allegation in the amended complaint's introduction that AHHC, as part of the "Hospital Defendants," fraudulently obtained GME funds from Medicare, [19] ¶ 4,  Relator describes AHHC as an "Illinois corporation that owns and operates hospitals" and says that AHHC, as part of the "Hospital Defendants," contracted with UIC to provide certain residency programs at ACMC.  *Id.* ¶¶ 19, 25.

Relator's only substantive allegation is that AHHC was "aware for over a decade of the conduct by all Defendants in falsely claiming reimbursement" for assistant surgeons.  *Id.* ¶ 63.  Setting aside the issue that no claim against "all Defendants" is tenable in this case, AHHC is not liable because "mere knowledge of a fraud is insufficient to sustain an FCA cause of action."  *Kalec*, 84 F. Supp. 3d at 802.  AHHC is dismissed.

### c)      Advocate Christ Medical Center (ACMC)

Relator's claims against ACMC fail for two different reasons.  First, Relator alleges that ACMC "submitted in excess of 8,000 claims to the Medicare program from 2006 through 2015 and received hundreds of thousands of dollars to which it was not entitled."  [19] ¶ 54.  Relator alludes to a nine-year period without providing any representative examples or specifics of the alleged fraud.  Without any "measure of substantiation," this allegation does not pass muster under Rule 9(b).  *Presser*, 836 F.3d at 776.

Second, Relator alleges that ACMC was "aware for over a decade of the conduct by all Defendants in falsely claiming reimbursement for services of assistant surgeons." *Id.* ¶ 63. Relator says that various ACMC officials were informed of the fraudulent behavior in about 2004 or 2005 and 2007. *Id.* Setting aside the issue that, once again, no claim against "all Defendants" is tenable in this case, "mere knowledge of a fraud is insufficient to sustain an FCA cause of action." *Kalec*, 84 F. Supp. 3d at 802. ACMC is dismissed.

### E. Leave to Replead

All defendants argue that the Court should dismiss Relator's amended complaint with prejudice, while Relator requests leave to replead any claims dismissed by the Court. [71]; [72]; [70]. Relator has the better argument.

Rule 15(a) dictates that trial courts "should freely give leave [to amend] when justice so requires." Rule 15(a)'s command can be outweighed by factors such as undue delay, bad faith, and futility. *Fish v. Greatbanc Trust Co.*, 749 F.3d 671, 689 (7th Cir. 2014). Those factors are not present here, and thus justice requires leave to amend. Now that Relator has notice of the deficiencies in his amended complaint, failing to properly address those deficiencies in any second amended complaint could result in a dismissal with prejudice.

## IV.    Conclusion

Defendants' motions to dismiss [59, 63] are granted.  Relator is given leave to replead all claims.


Dated:  September 28, 2017

Entered:

John Robert Blakey
United States District Judge